BAUTISTA SERRANO by himself and as father with patria po-testas of VICENTE SERRANO, MARGARITA SERRANO, and LUIS SERRANO, Plaintiffs and Appellants, *v.* PUERTO RICAN CEMENT CORPORATION and INSURANCE COMPANY OF NORTH AMERICA, Defendants and Appellees; FELÍCITA SOTO and EMILIANO OQUENDO by themselves and as parents with patria potestas of minor LUIS ANTONIO OQUENDO SOTO, Plaintiffs and Appellants, *v.* PUERTO RICAN CEMENT CORPORATION and INSURANCE COMPANY OF NORTH AMERICA, Defendants and Appellees; AMADOR OQUENDO TORRES, Plaintiff and Appellant, *v.* PUERTO RICAN CEMENT CORPORATION and INSURANCE COMPANY OF NORTH AMERICA, Defendants and Appellees.

No. R-69-194. · Decided November 16, 1970.

*Jorge Díaz Cruz* and *Nelson Escalona Vincenty* for appellants.
*Juan Enrique Géigel, Guillermo Silva, Hernán G. Pesquera,
E. Rodríguez Font,* and *Ignacio Rivera Cordero* for appellees.

PER CURIAM: A group of children residents of Barriada Los Chinos adjacent to land belonging to the Ponce Cement trespassed the grounds of the latter to go and play on the top of a mount where there was a quarry shaft which the evidence presented describes as a "cave." The upper part of the "cave" collapsed, burying them. Only one of them came out alive.

The complaints filed against Puerto Rican Cement and its insurer were dismissed.

Below are the findings of fact which served as the grounds for the judgment rendered:

"The Puerto Rican Cement Corp. is the owner of seven hundred (700) cuerdas of land, which form only one property in Barrio Canas in Ponce, Puerto Rico. Part of this land is utilized for the industrial operations of a cement factory, in operation since the year 1941; and approximately 270 cuerdas are quarries from where the raw material for the manufacture of cement is

extracted. There are fifty (50) abandoned quarry shafts.

"On the northern boundary of the grounds of the Puerto Rican Cement Corp., hereinafter referred to as the Puerto Rican Cement, there is a slum known as 'Barriada Los Chinos' or the 'Joya Los Chinos', inhabited by about 300 or 400 families, with whom hundreds of children live.

"The property of codefendant Puerto Rican Cement starts where the cement block fence of the Civil (municipal) Cemetery comes to an end; which fence is over six feet high.

"All along the northern boundary of the property of the Puerto Rican Cement there are vestiges of an enclosure or barbed-wire fence and there is an alley which serves as the access to Barriada Los Chinos.

"In the year 1966 said enclosure or fence was rather dilapidated, but most of its concrete posts were erect. Although its posts were for twelve (12) strands of wire, in some places, between post and post, they still had eight strands of barbed wire; five in others; some of the posts were covered by the ground or fallen down; others did not have any wires, or showed traces that its wires were cut off, or the wires were lying on the ground. The fence has been in poor condition for several years.

"Originally, in the year 1941, the posts which served as support for the wire fence were wooden poles, later on they put in iron poles but the people carried them away or destroyed them and, finally, they constructed the fence with concrete posts, six feet high, embedded in a concrete base, about six to eight feet from each other.

"At the place where the alley of Barriada Los Chinos comes even with the border line of the property of Puerto Rican Cement it becomes extremely narrow. Rather it becomes a path intransitable for motor vehicles. At the end of said alley there is a slope on the opposite side of the property of the aforementioned codefendant.

"The children and youngsters of Barriada Los Chinos used to play within the grounds of the Puerto Rican Cement, and it was a place for entertainment when it rained, since a lake was formed on the level land of the property.

"The inhabitants of the Barriada in question also brought their animals to graze within the property of the Puerto Rican Cement, causing the destruction of the wire fence in different places.

"The Managers of the Puerto Rican Cement were aware of that situation and they even had in mind to put up a cyclone fence, but it was too expensive.

"Norberto Colón, safety supervisor of the aforementioned codefendant had seen for ten or eleven years the children playing within the grounds and on many occasions he had to drive them away from there.

"There was no signal or sign prohibiting the entrance to the property of the Puerto Rican Cement or a watchman to watch over it or to prevent the entrance thereinto. They had a watchman of the Wackenhud [sic], who was discontinued because they threw stones at him.

"Luis Antonio Oquendo Soto was born on June 30, 1953, he lived with his mother Felícita Soto González in Barriada 'Los Chinos'; two years before he had dropped from elementary school, which he attended up to the third grade, and he could read and write.

"On April 6, 1966, Wednesday of the Holy Week, about 2:00 p.m., Luis A. Oquendo Soto, accompanied by his cousin Ángel Luis Oquendo and by his friends Francisco Soto González, Jesús Serrano, Samuel Serrano, and David Serrano decided to go and play and enjoy the fresh air in a cave located on the top of a mount.

"Luis A. Oquendo Soto put some ice in a can, from his grandfather's electric refrigerator, bought refreshments, and trespassed, without permission, 'through an entrance in the upper part', on the level part of the property of the Puerto Rican Cement. In order to arrive at the cave they had to climb up a very steep and rocky slope. Said cave was in an area destitute of fruit or foliage trees, surrounded by rugged land. On the way they did not meet anybody.

"The evidence did not state precisely the exact route followed by the young excursionists.

"Witness Luis A. Oquendo Soto describes the cave as a little larger than the one shown in defendant's Exhibits 1H, 1I, 1K, 1L, 1N, 2K and plaintiffs' Exhibit 1A.

"The ice had melted; they drank the refreshments and started to play inside the cave throwing sand at each other with their hands. Suddenly the roof of the cave collapsed. Luis A. Oquendo Soto remained buried up to his neck with his head uncovered and he could get out. The others who accompanied him, Francis-

co Soto González, Ángel Luis Oquendo, Jesús Serrano, Samuel Serrano, and David Serrano were trapped therein.

"At the time of the landslide Luis A. Oquendo did not hear any noise. He had been at the place four or five times, a month before, accompanied by those who died and other friends, and he noticed that 'some dirt from the roof of the cave' fell down and that the noise produced by the trucks of the factory when they passed by could be heard therein. He did not state exactly along what place the vehicles traveled.

"When Luis A. Oquendo could get out of the cave he went to his grandfather's house, Francisco Soto Echevarría, father of Francisco Soto González, informed him what had occurred and they went to the place of the landslide. On the way they were overtaken by Guillermo Matos Saldaña, Francisco Soto's son-in-law, and Ángel Luis Oquendo's stepfather. They went to the scene of the event. They did not see anything nor found anybody. Then Matos Saldaña, mounting a horse, went to the cement plant to ask for help. On the way. he met Víctor Guadalupe González, employee of the aforementioned codefendant, who, at that moment, was operating a finger lift machine and informed him what had occurred; they went to the place. Then González notified the occurrence to Norberto Colón, superintendent of the quarry of the Puerto Rican Cement.

"Officers and employees of the Puerto Rican Cement appeared at the place; the salvation work was organized and initiated. Later on the police, the firemen, and the Civil Defense arrived.

"The ambulance, the finger lift machine, and other vehicles could only approach to a distance of approximately one hectometer from the place of the collapse because the land was so rocky.

"Guadalupe González helped rescue four (4) of the children who had been buried. The first two who were rescued showed signs of life and artificial respiration was applied to them. They were sent in an ambulance to the hospital but the endeavors were unsuccessful. Many people gathered at the place and a rope was placed in order to prevent them from interfering with the task of rescuing the children. After five children were rescued the rumor circulated that one was missing. Then they used a tractor loader which came right to the scene of the landslide, to

remove the earth from the interior of the cave until they reached the rock.

"In the cave they found two glass jars, a piece of machete 10 to 20 inches long, a bottle of Coca Cola, a shirt and two kitchen knives.

"The only survivor of the tragedy was Luis A. Oquendo Soto.

"On the southwestern part of the grounds of the Puerto Rican Cement, that is, in the area of the landslide, there had existed a quarry shaft for the extraction of limestone, which had not been exploited since the year 1952, because of the poor quality of the material, since the limestone was mixed with sand. Since the year 1952 said quarry has been abandoned and unused. When it was being exploited the limestone was extracted making a shaft with a power shovel or tractor; a machine crushed the stone and a bulldozer dragged it to the level land where the trucks gathered it, since the latter could not climb up.

"Three or four hundred meters away from the cave there was a gigantic wooden star which had been installed about fifteen years before and which they illuminated at Christmas time and it glittered and twinkled. In order to go to said star they constructed a path, or rather an unpaved footpath three or four meters wide, which runs 40 to 50 meters over the cave. A tractor smoothed this path once a year. The only vehicle that traveled along it was the jeep of the Puerto Rican Cement employee, in order to reach the star to repair the bulbs. There is also another rugged and rocky path leading to the cave, which is intransitable.

"The cave is located on a hummock or limestone hill of the oligocene period of the middle Tertiary age. The calcareous soil is of the nature of argil or clay showing thin layers in several outcrops and, specifically in the site of the landslide, an interstratification of marly, with sand particles (thin stratus of sand and lime) showing an inclination or slide toward the south. It consists of 80% quartz and 20% calcium carbonate. The one on the road is more washed out and it is two percent (2%) clay and ninety-eight percent (98%) quartz.

"The petrologic or lithologic nature of the soil shows a high degree of improbability that the cave is the result of natural causes. The sandy nature of the site does not permit internal structural stability for the formation of a cave. The cave is

formed by a process of solution as a result of the action of the water (rain or river).

"On January 26, 1968, José Francisco Cadilla, Director of the Program of Geology and Economic Resources and Professor of Geology of the University of Puerto Rico, examined, during one hour, the site where the tragic accident occurred; he approached the cave at a distance of about twenty meters therefrom, since he could not enter because it was fenced, and took several samples of the soil. He is certain that it is an artificial excavation, product of man's labor.

"According to the aforementioned geologist, any strong or weak vibration or trepidation, within the radius or area of action where the cave is, may produce a landslide where, as in this case, the base is of a sandy nature.

"From the inspection performed it appears that coming from 'above', that is, from the end of the alley of Barriada Los Chinos, the cave is approximately half a kilometer from said alley; and that in order to go there an esplanade must be crossed and then climb up a rough and steep path on a hillside.

"Measuring the course followed by the participants of the inspection, Norberto Colón found that there were 1,233 feet up to the cave.

"A landslide had never before occurred on the grounds of the Puerto Rican Cement.

"The cave is not distinguishable from Barriada Los Chinos because of the topography of the land and the distance.

"The parents and relatives of the survivor and of the unfortunate children did not know about the existence of the cave. Felícita Soto testified that two or three times she had visited a cave on the grounds of the Puerto Rican Cement with her children Arnaldo Oquendo and Sandralea Román, but that she did not know that her son, Luis A. Oquendo Soto, had visited said cave. However, in answer No. 26 to the interrogatories submitted to her, Felícita Soto answered that her son, Luis A. Oquendo Soto, had visited the cave twice for an hour and a half prior to April 6, 1966, with the same friends who died.

"Feliciano Rodríguez Plata and Roberto Palmieri, Supervisor and Superintendent of the quarry of the Puerto Rican Cement, respectively, knew the site where the accident occurred and had noticed a small crevice; that the former saw it about a month before on the top of the hill and describes it as 'very small,

slight', and the second had noticed it by November 1965. These codefendant's employees had also seen children playing with the sand in said surroundings and called their attention urging them to go away from there. The elimination of the cave would have cost no more than one hundred dollars. The so-called cave was not a natural formation.

"After the collapse, defendant Puerto Rican Cement Corp. fixed the fence which separated its land from the Barriada Los Chinos."

Thus we see that the evidence established, aside from the other facts which are not pertinent to the defendants' liability toward the plaintiffs, that the children from Barriada Los Chinos used to play within the grounds of the Puerto Rican Cement, that defendant's employees had knowledge of this situation, and the firm had in mind to put up a fence but it would be too expensive; that defendant's employees used to drive the children who trespassed defendant's grounds out of the place; that the cave where the accident occurred was formed upon extracting material for the cement factory; that the supervisors of the Puerto Rican Cement quarry had noticed, several months before the accident, a small crevice on the top of the hill; that the soil is sandy and that the elimination of the cave would have cost one hundred dollars at the most. It was also established that the children's parents did not have knowledge of the existence of the cave.

In *Díaz v. Central Lafayette*, 66 P.R.R. 780 (1947) ratified in *Vargas v. Water Resources Authority*, 86 P.R.R. 99 (1962), we established that the possessor of land is subject to liability for bodily harm to children trespassing thereon, provided certain circumstances are present, irrespective of the fact that they are intruders. In order to establish liability we adopted the generally accepted rules set forth in § 339 of Restatement on Torts. They are the following:

"A possessor of land is subject to liability for bodily harm to young children trespassing thereon caused by a structure or

other artificial condition which he maintains upon the land, if

"(a) the place where the condition is maintained is one upon which the possessor knows or should know that such children are likely to trespass, and

"(b) the condition is one of which the possessor knows or should know and which he realizes or should realize as involving an unreasonable risk of death or serious bodily harm to such children, and

"(c) the children because of their youth do not discover the condition or realize the risk involved in intermeddling in it or in coming within the area made dangerous by it, and

"(d) the utility to the possessor of maintaining the condition is slight as compared to the risk to young children involved therein, and

"(e) the possessor fails to exercise reasonable care to eliminate the danger or otherwise to protect the children."

All the aforementioned circumstances are present in the case at bar.

(a) Defendant had knowledge that the children trespassed its grounds to play.

(b) In view of the artificial formation of the cave and the nature of the soil of which it was formed, as well as the crevice that it had in the upper part, evidently this cave was a dangerous place for the children. The trial court stated that "The cave was an extremely dangerous place for the children to play therein. The danger was in its geologic conformation, due especially to the sandy nature of its base, with a dip or inclination toward the south."

(c) The children, because of their age, fluctuating between 9 and 14 years, could not realize the risk involved in playing in the cave.

(d) Maintaining the cave did not represent any benefit whatsoever for defendant.

(e) Certainly, defendant failed to exercise reasonable care to eliminate the danger. With a disbursement of not more than $100 it could have eliminated the cave. The fact that defendant's employees drove out the children who trespassed

defendant's premises does not exonerate it from liability, since it was not shown that they were warned of the danger involved in playing in the cave. Prosser, Torts 262 (3d ed.).

The trial court stated in its conclusions of law:

"For the children and adolescents of Barriada Los Chinos, who lack the most elementary facilities for recreation, the esplanade of the property of defendant Puerto Rican Cement is the most accessible and adequate place to practice sports and play. To survive confined in a slum is not their fault. The children of Barriada Los Chinos can hardly be reprimanded for trespassing defendant's property to play.

"Naturally, the cave was a place which, after being discovered, induced the children of the ages of the Serrano brothers to visit it and to dream therein numberless imaginary adventures."

In *Salvá Matos* v. *Díaz Const. Corp.*, 95 P.R.R. 880, 885 (1968), we stated:

"In this *Ramos* case, an exhaustive study of Justice Córdova Dávila, we stated (p. 343): 'If the owner of the property has grounds to anticipate the presence of children at the time he creates the dangerous condition, his duty is to adopt all due and reasonable precautions to avoid injury and save himself from liability. It does not matter if the child is a trespasser. It is not necessary, therefore, that the dangerous condition should have induced him to enter upon the property. *It is sufficient that his presence could have been reasonably anticipated.*' We expressly accepted from the doctrine the rule that 'if there was reason to anticipate the presence of children, it would make no difference how the child who was injured happened to come upon the premises.'" (Italics in the original.)

See also: *Díaz Colón* v. *Land Authority*, 96 P.R.R. 42 (1968); *Nieves* v. *Cruz*, 85 P.R.R. 221 (1962); *Pérez Vázquez* v. *Heirs of Amill*, 89 P.R.R. 363 (1963).

■ Evidently defendant was negligent in maintaining a dangerous situation, having knowledge that children came there to play.

It is proper to reverse the judgment rendered by the Superior Court, Ponce Part, and to remand the case for the award of damages.

Mr. Chief Justice Negrón Fernández as well as Mr. Justice Pérez Pimentel, Mr. Justice Hernández Matos, and Mr. Justice Martínez Muñoz did not participate herein.